Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 28, 2019

**2019 CO 43**

**No. 17SC350, Colo. Custom Maid v. ICAO & Div. of Unemp't Ins.—Unemployment Tax Liability**

The supreme court determines whether Colorado Custom Maid (CCM), which considers itself a referral service, employs house cleaners for purposes of the Colorado Employment Security Act (CESA). Because the realities of CCM's relationship with its cleaners are those of an employment relationship, the court concludes that CCM is liable for unemployment taxes on wages paid to the cleaners. In so doing, the court disapproves the notion that to determine whether an individual is an employee under the CESA, section 8-70-115(1)(b) requires a "threshold" showing that the services being provided by the putative employee are being provided for the benefit of the putative employer.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2019 CO 43

**Supreme Court Case No. 17SC350**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 16CA75

**Petitioner:**

Colorado Custom Maid, LLC,

v.

**Respondents:**

Industrial Claim Appeals Office and Division of Unemployment Insurance.

**Judgment Affirmed**
*en banc*
May 28, 2019

**Attorneys for Petitioner:**
James Abrams, LLC
James Abrams
    *Denver, Colorado*

**Attorneys for Respondent Industrial Claim Appeals Office:**
Philip J. Weiser, Attorney General
Emmy Langley, Assistant Solicitor General
    *Denver, Colorado*

No appearance on behalf of Division of Unemployment Insurance.

**JUSTICE HART** delivered the Opinion of the Court.
**JUSTICE HOOD** does not participate.

¶1 Colorado Custom Maid (CCM) places house cleaners with clients who need their homes cleaned. In doing so, it has tried to avoid becoming the house cleaners' employer, hoping instead to maintain the relationship as one between a referral service and a group of independent contractors so that it could avoid paying unemployment taxes on the money it paid to those cleaners.

¶2 In 2014, the Colorado Department of Labor and Employment Division of Employment and Training (Division) concluded that, despite CCM's efforts to characterize them as independent contractors, CCM's cleaners were in fact employees for whom the company should be paying unemployment taxes. After evaluating the dynamics of the relationship between CCM and its cleaners, we agree. We therefore affirm the court of appeals' decision, which itself affirmed the conclusion of an Industrial Claim Appeals Office Panel (Panel) that the realities of CCM's relationship with its cleaners establish an employment relationship.

## I. Facts and Procedural History

¶3 CCM describes itself as a referral service that matches house cleaners with homeowners. The company recruits potential cleaners and, after checking their work and criminal histories, enters into contracts that specify that the cleaners are independent subcontractors. When a homeowner contacts CCM, the company assesses how frequently the home will be cleaned, determines how long each cleaning will take, and sets a price for the cleaning. CCM then assigns one of its contracted cleaners to the home. Each time a home is cleaned, the homeowner writes a check to CCM and CCM in turn gives the cleaner forty-seven percent of what it was paid by the homeowner.

2

¶4 In May 2014, the Division conducted an audit of CCM for the three preceding years to determine whether CCM properly classified its cleaners as independent contractors. The Division concluded that the cleaners should have been classified as employees under the Colorado Employment Security Act (CESA) and required CCM to pay unemployment taxes on the amounts it had paid to the cleaners during those years.

¶5 CCM appealed. A hearing officer reversed the Division's decision, concluding that CCM had proven, as required by section 8-70-115(1)(b), C.R.S. (2018), that the cleaners were free from CCM's control and direction and that they customarily engaged in an independent business of providing cleaning services. The Division appealed.

¶6 The Panel reversed the hearing officer's decision because it determined that the hearing officer made two significant errors. First, the Panel concluded that the hearing officer failed to make sufficient factual findings to determine whether the cleaners were in fact customarily engaged in independent businesses. Second, the Panel held that the hearing officer failed to consider the totality of the circumstances, or the dynamics of the relationship between CCM and the cleaners, in concluding that the cleaners were customarily engaged in an independent business. *See Indus. Claim Appeals Office v. Softrock Geological Servs., Inc.*, 2014 CO 30, ¶ 2, 325 P.3d 560, 562 (requiring a totality of the circumstances test that evaluates the dynamics of the relationship between the putative employer and employee to determine whether an individual is engaged in an independent trade or business).

¶7 On remand, the hearing officer made additional factual findings and again concluded that the cleaners were independent contractors. The Division appealed, and

3

the Panel once again reversed the hearing officer's decision. Although the Panel adopted some of the hearing officer's factual findings, it set several of them aside. The Panel determined that a number of the hearing officer's findings were not supported by the evidentiary record and others were contradicted by factual concessions made by CCM. After conducting its own review of the factual record, the Panel found that the cleaners were employees, not independent contractors, under the totality of the circumstances. CCM appealed the second Panel determination.

¶8 The court of appeals agreed with the Panel's conclusions. *Colo. Custom Maid, LLC v. Indus. Claim Appeals Office*, No. 16CA0075, ¶¶ 1, 8, 18, 38 (Colo. App. March 9, 2017). The court first examined whether the cleaners performed services for the benefit of CCM. *Id.* at ¶ 8. To this question, the court answered yes. *Id.* at ¶ 15. The court held that CCM derived a purposeful benefit from the cleaners' work because it maintained an ongoing relationship with the cleaners and the clients. *Id.* at ¶ 16. Having addressed what it characterized as a "threshold matter," *id.* at ¶ 10, the court then employed section 8-70-115(1)(b)'s two-prong test to determine whether there was substantial evidence to support the Panel's finding that the cleaners were (1) free from CCM's control and direction in the performance of their cleaning services and (2) engaged in an independent trade or business. *Id.* at ¶¶ 22–25. In making this determination, the court of appeals recognized that the Panel set aside a number of the hearing officer's factual findings but concluded that the Panel did not err in doing so because the majority of those set aside were contradicted by undisputed evidence in the record. *Id.* at ¶¶ 31–38. Ultimately, the

4

court of appeals concluded that there was sufficient evidence to support the Panel's conclusion that the cleaners were employees for purposes of CESA. *Id*. at ¶ 38.

¶9      CCM petitioned for certiorari and we granted the petition.[1]

## II. Analysis

¶10     We begin by setting out the standard of review, both for our consideration of the Panel's determination and for the Panel's review of the hearing officer's findings. We then offer a brief overview of the statutory framework for determining whether employers may classify individuals as independent contractors rather than employees for CESA unemployment tax purposes. In doing so, we disapprove the notion, first suggested by the court of appeals in *Employer Services* and accepted by the division here, that the statute requires a "threshold" showing that the services being provided by a putative employee are being provided for the benefit of the putative employer. *Id.* at ¶ 10; *see Div. of Unemp't Ins., Emp'r Servs. v. Indus. Claim Appeals Office*, 2015 COA 149, ¶ 10, 361 P.3d 1150, 1152 (hereinafter *Employer Services*). Finally, we apply the two-prong test provided in section 8-70-115(1)(b), C.R.S. (2018), and conclude that there was

---

[1] We granted certiorari to review the following issue:

> Whether the Court of Appeals erred in finding that, for the purpose of assessing unemployment tax premiums under the Colorado Employment Security Act, individuals (cleaners) who performed cleaning services in private homes were employees of the referral service, Colorado Custom Maid, which linked them with clients who are homeowners seeking cleaning services.

substantial evidence to support the Panel's determination that the cleaners were employees.

## A. Standard of Review

¶11 To rebut CESA's presumption of employment, the employer has the burden of demonstrating that a putative employee is in fact an independent contractor. *See Softrock*, ¶ 9, 325 P.3d at 563. Whether an employer has met this burden is a question of fact. *Id.*; *see W. Logistics, Inc. v. Indus. Claim Appeals Office*, 2014 CO 31, ¶ 11, 325 P.3d 550, 552. We will not disturb the Panel's conclusion that the cleaners were employees if it properly applied the law and the findings of fact support its conclusion. § 8-74-107(6)(c), (d), C.R.S. (2018); *see Softrock*, ¶ 9, 325 P.3d at 563; *W. Logistics*, ¶ 11, 325 P.3d at 552; *see also Allen Co., Inc. v. Indus. Comm'n*, 762 P.2d 677, 680 (Colo. 1988) (holding that the ICAO's decision "should not be disturbed if it is supported by substantial evidence").

¶12 In the administrative hearing process, evidentiary facts found by the hearing officer must not be set aside by a panel of the ICAO unless they are "contrary to the weight of the evidence." § 24-4-105(15)(b), C.R.S. (2018); *Samaritan Inst. v. Prince-Walker*, 883 P.2d 3, 9 (Colo. 1994). Ultimate facts, which are "conclusions of law or mixed questions of law and fact that are based on evidentiary facts and determine the rights and liabilities of the parties," require less deference by the Panel to the hearing officer. *Federico v. Brannan Sand & Gravel Co.*, 788 P.2d 1268, 1272 (Colo. 1990). The Panel is entitled to make its own determination as to ultimate facts, so long as that determination "has a reasonable basis in law and is supported by substantial evidence in the record." *Samaritan Inst.*, 883 P.2d at 9.

## B. Applicable Law

¶13 CESA requires employers to pay unemployment taxes on wages paid to employees but not on compensation paid to independent contractors. §§ 8-76-101 to -102.5 C.R.S. (2018); *see Softrock*, ¶ 11, 325 P.3d at 563. The law starts with a presumption that services performed by an individual for another "shall be deemed" covered employment for unemployment tax liability purposes. § 8-70-115(1)(b). This presumption can be overcome in one of two ways. First, a putative employer may rebut the employment presumption by producing a written document signed by both parties and containing nine expressly stated limitations on the relationship that distinguish it from that of employer and employee.[2] § 8-70-115(1)(c)(I)–(IX). In the absence of such a

---

[2] These limitations include:

> . . . that the person for whom services are performed does not:
>
> (I) Require the individual to work exclusively for the person for whom services are performed; except that the individual may choose to work exclusively for the said person for a finite period of time specified in the document;
>
> (II) Establish a quality standard for the individual; except that such person can provide plans and specifications regarding the work but cannot oversee the actual work or instruct the individual as to how the work will be performed;
>
> (III) Pay a salary or hourly rate but rather a fixed or contract rate;
>
> (IV) Terminate the work during the contract period unless the individual violates the terms of the contract or fails to produce a result that meets the specifications of the contract;
>
> (V) Provide more than minimal training for the individual;
>
> (VI) Provide tools or benefits to the individual; except that materials and equipment may be supplied;

signed document, the putative employer can offer facts to demonstrate by a preponderance of the evidence that (1) the worker "is free from control and direction in the performance of the service," and (2) the worker "is customarily engaged in an independent trade, occupation, profession, or business related to the service performed." § 8-70-115(1)(b). While both elements must be demonstrated to overcome the presumption of employment, the inquiries are necessarily interrelated—each requires an expansive inquiry into the dynamics of the relationship between the putative employee and employer to determine whether an employment relationship exists, and certain facts about the relationship may be relevant to both elements. *W. Logistics*, ¶ 3, 325 P.3d at 551.

¶14     In evaluating whether an individual providing services is free from direction and control, we consider the totality of the circumstances, focusing on whether the putative employer has a general right to control and direct the individual in the performance of the service. *See Allen Co.*, 762 P.2d at 680; *see also* Dep't of Labor & Emp't Reg. 17.1.2, 7 Colo. Code Regs. 1101-2 (2018) (requiring the hearing officer and Panel to consider "[t]he totality of the circumstances of the relationship between the company for whom services

---

(VII) Dictate the time of performance; except that a completion schedule and a range of mutually agreeable work hours may be established;

(VIII) Pay the individual personally but rather makes checks payable to the trade or business name of the individual; and

(IX) Combine his business operations in any way with the individual's business, but instead maintains such operations as separate and distinct.

§ 8-70-115(1)(c)(I)–(IX).

are performed and the worker" when assessing whether an individual is an employee or independent contractor). An "employer's firm hand in controlling the details of the manner and method of job performance" evinces an overall right to control the actions of an employee. *Rent-A-Mom, Inc. v. Indus. Comm'n*, 727 P.2d 403, 406 (Colo. App. 1986). But control over the details of performance is not required. Indeed, we have explained that simply the right to terminate a service contract without liability is an important factor in determining "whether the individual is free of control and direction 'because the right immediately to discharge involves the right of control.'" *Allen Co.*, 762 P.2d at 681 (quoting *Indus. Comm'n v. Nw. Mut. Life Ins. Co.*, 88 P.2d 560, 564 (Colo. 1939)).

¶15 The second element of the showing a putative employer must make to overcome the employment presumption is that the individual providing services is customarily engaged in an independent trade or a business related to the services performed. Stripped of legal jargon, this question asks whether the worker is an independent contractor with his or her own business that provides the particular services. In answering this question, we again look to the totality of the circumstances surrounding the relationship between the worker and the putative employer. *See Softrock*, ¶ 14, 325 P.3d at 564. As we noted in *Softrock*, consideration of the nine conditions in section 8-70-115(1)(c) is helpful here, since the legislature has directed that if the parties agree to those nine conditions, the presumption of an employer-employee relationship is overcome. *Id.* at ¶ 15, 325 P.3d at 564–65. But a review of these conditions alone does not end our inquiry. "[T]he nine factors in section 8-70-115(1)(c) as well as any other information relevant to the nature of the work and the relationship between the employer

9

and the individual" should be considered to determine whether an individual is engaged in an independent trade or business. *Id.* at ¶ 17, 325 P.3d at 565. For example, courts have considered whether the putative employee (1) had business cards, a business address, or a business telephone number; (2) made a financial investment in the services such that he or she could be vulnerable to financial loss in connection with performance of the service; (3) had his or her own equipment; (4) set the price of the service; (5) employed assistants; and (6) carried his or her own liability or workers' compensation insurance. *See Visible Voices, Inc. v. Indus. Claim Appeals Office*, 2014 COA 63, ¶ 26, 328 P.3d 307, 311–12 (Colo. App. 2014).

¶16 CCM contends that before addressing the two-prong test above, section 8-70-115(1)(b) requires a preliminary showing that the service provided by the putative employee was provided for the benefit of the putative employer. In support, CCM points to the court of appeals' decision in *Employer Services*, holding that CESA requires an initial finding that an employee performed "an act done for the benefit or at the command of another" for an employment relationship to exist. ¶ 10, 361 P.3d at 1152 (quoting *Magin v. Div. of Emp't*, 899 P.2d 369, 370 (Colo. App. 1995)). This benefit, the court explained, must be "purposeful or intended," not inadvertent. *Id.* at ¶ 15, 361 P.3d at 1152. Because the putative employees in *Employer Services*, individuals seeking acting and modeling work, did not perform acting or modeling services for the purpose of benefiting the putative employer, a talent agency that referred the actors and models to job opportunities, the court determined that the talent agency did not employ the artists but merely arranged for them to provide services for third parties. *Id.* at ¶¶ 16–17, 361 P.3d

10

at 1152. CCM contends that, like the talent agency in *Employer Services*, it too does not employ the cleaners. Instead, CCM merely refers the cleaners to third-party homeowners. Because the intended benefit is derived by the homeowner, not by CCM, CCM argues that the employment inquiry must end at this threshold question.

¶17 CCM's reading of section 8-70-115(1)(b) is inconsistent with both the purposes of the statute and our prior interpretations of the law. The presumption of employment within the unemployment insurance statute exists because the legislature intended to ensure complete coverage, protecting workers against the risks of involuntary unemployment. *See Softrock*, ¶ 14, 325 P.3d at 564 (explaining that the purpose of CESA is to "protect employees from the negative consequences of involuntary unemployment"); *see also* § 8-70-102, C.R.S. (2018) (setting out the legislative purposes of the unemployment insurance laws). Requiring the preliminary showing that CCM advances here would have the opposite effect; it would permit a wide range of employers to avoid paying unemployment taxes. Under CCM's reading of the law, employers across service industries could justify classifying employees as independent contractors by alleging that the individuals perform services "for" the customers or clients, not "for" the employer. There is no such loophole to be exploited in CESA. And creating one is inconsistent with our prior caselaw, which has never required this threshold showing. Instead, as we have explained here and in other decisions, section 8-70-115(1)(b) begins with a presumption of employment that a putative employer can only rebut by making the required statutory showings.

## C. Application

¶18     Applying these standards, did the Panel appropriately conclude that CCM had failed to overcome the employment presumption by demonstrating that it did not exercise direction and control over the cleaners and further that the cleaners were customarily engaged in an independent business such that they are properly characterized as independent contractors?  It did.

¶19     We look first to the Panel's conclusion that CCM exerted control over and directed the cleaners in the performance of their work.  In reaching that conclusion, the Panel set aside the hearing officer's finding that CCM is no longer involved in the client-cleaner relationship after assigning a cleaner to a client.  While recognizing that this is generally true about the details of the cleaning, the Panel found that the evidence adduced at the hearing shows that CCM exerts extensive control over the cleaners in the resolution of client complaints.  During the hearing, one cleaner, Andrea Hernandez, testified that she was asked to assist a cleaner about whom CCM had received a complaint and "train her to do the work properly."  Other cleaners who testified corroborated that CCM exercised this kind of quality control.  This type of oversight, the Panel concluded, is "exactly the control and direction referred to by [section] 8-70-115(1)(b)."

¶20     The Panel also concluded that CCM has the right to control whom the cleaners hire as assistants.  One of CCM's owners testified during the hearing that cleaners are prohibited from acquiring helpers to assist with cleaning client homes without approval from CCM because CCM's "reputation is at stake."  Despite testimony that this

12

prohibition was violated at times, the Panel determined that CCM "retained the right to control who was used as a helper."

¶21    Finally, the Panel concluded, based on the hearing officer's findings, that CCM controls the collection and distribution of fees paid by the clients. CCM negotiates the price with the client, collects the payment from the client, and pays the cleaners forty-seven percent of the amount charged each time the cleaner provides services to a client. Far from arranging a one-time referral of a cleaner to a client, CCM maintained a continuous relationship with the client homeowners and with the cleaners. CCM received payment each time the worker provided cleaning services for the client and assignments were not for a limited time. Some cleaners "worked for CCM for years in an open-ended relationship." The Panel further noted that CCM set the price for cleaning based on the amount of time the cleaning would take and the frequency of the cleaning services, so that the payment to the cleaners was effectively an hourly rate. For all of these reasons, the Panel concluded that the cleaners are dependent on CCM for continued work at a salary set by CCM and the relationship bears the hallmarks of control and direction characteristic of an employment relationship. Because these conclusions are supported by the hearing officer's findings of fact and the applicable legal standards, we see no basis for setting them aside.

¶22    As to the Panel's determination that CCM had not sufficiently demonstrated that the cleaners were engaged in an independent business, we again see no basis for disturbing that determination. In reaching that conclusion, the Panel reviewed and relied on the following facts found by the hearing officer: the cleaners were paid in their

13

personal names, not in any independent business name; none of the cleaners had any of the indicia of an independent business, such as cards, an address, financial investment, or liability insurance; and the cleaners did not control the amount they were paid for their work but instead received payments that were effectively hourly payments set by CCM. Based on these findings, the Panel reasonably concluded that the cleaners were not customarily engaged in an independent business.

¶23    CCM disagrees, primarily arguing that many of the cleaners had clients of their own in addition to those they cleaned for through CCM. This, CCM contends, indicates that the cleaners were engaged in an independent business. The Panel did acknowledge in its findings that "most cleaners also have other work outside of their relationship with CCM" and even considered that fact to "support a conclusion that the cleaners are independent contractors." Although it is true that maintaining outside clients supports a finding that individuals are engaged in an independent trade, this factor is not dispositive, but is just one of many to be considered. *See Softrock*, ¶ 18, 325 P.3d at 565 (rejecting the argument that "whether the individual actually provided services for someone other than the employer is dispositive proof of an employer-employee relationship"). And the Panel did consider it, but still concluded that, under the totality of the circumstances, the cleaners were employees. We must defer to this ultimate factual conclusion unless it lacks evidentiary support, which it does not.

¶24    CCM further contends that the Panel erred in substituting the hearing officer's findings with those of its own. Specifically, CCM argues that the Panel erred in finding that CCM established a quality standard, that CCM paid the cleaners a salary, and that

14

CCM had control over the cleaners' schedules and ability to hire assistants. While the Panel and the hearing officer interpreted the facts differently, we cannot conclude that the Panel erred in its ultimate conclusion that the cleaners were employees. As to the particular facts that the Panel set aside, we are persuaded that they were either ultimate facts, which did not require deference from the Panel, or evidentiary facts that were not supported by the record. *See Samaritan Inst.*, 883 P.2d at 9 (explaining the difference between ultimate facts and evidentiary facts in the hearing process).

¶25 The Panel thoroughly considered the dynamics of the relationship between CCM and the cleaners and meticulously reviewed the nine conditions of section 8-70-115(1)(c) as well as other relevant facts developed in the hearing record to conclude that the cleaners were employees under the totality of the circumstances. We are satisfied that the hearing officer's findings, the Panel's findings, and the record evidence support the Panel's determination that CCM failed to meet its burden of establishing that the cleaners were customarily engaged in an independent trade or business of providing cleaning services.[3] *Softrock*, ¶ 9, 325 P.3d at 563.

### III. Conclusion

¶26 Because substantial evidence supports the Panel's ultimate determination that CCM failed to meet its burden of showing that CCM did not exercise direction and

---

[3] CCM requests that we award attorney fees for this appeal. We deny CCM's request because it neither prevails on appeal nor cites any legal or factual basis for such an award. *See* C.A.R. 39.1.

control and that the cleaners were customarily engaged in an independent trade or business related to their provision of cleaning services, we will not disturb that determination on review.  Accordingly, we affirm the judgment of the court of appeals.